UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ANTHONY AULT,

                Petitioner,

**MEMORANDUM & ORDER**

-against-

05 CV 3115 (RJD)

DAVID MILLER, Superintendent,
   Eastern New York Correctional Facility,

                Respondent.
-------------------------------------------------------------X
DEARIE, Chief Judge.

     Petitioner and his accomplices devised and carried out a plan to steal $17,000 in cash from an individual expected to be carrying the sum in a briefcase to a realtor appointment as downpayment on a house. In a statement to police, petitioner admitted that he helped plot the attack, participated in the stakeout with "Eddie" (his codefendant), and pointed out the victim to Eddie from the vehicle in which they had been riding, a four-door blue Buick. Eddie left the vehicle, grabbed the victim's case and, during the ensuing struggle, shot the victim through the heart, killing him.

     Edwin Gruber, who witnessed the events from his second floor window, positively identified the killer but did not place petitioner at the scene. Gruber saw the blue Buick double-parked during the struggle and watched it begin to creep slowly down the street with the back door open to facilitate the assailant's escape. Gruber also witnessed the ensuing escape, as the assailant (Eddie) jumped into the back seat after the shooting and the vehicle sped off. Gruber did not have a view of the driver's side, but saw through the windshield that there was no one in the front passenger seat.

Within approximately two minutes, following a 911 call and police radio transmissions, officers were on the blue Buick's trail, and a brief, high speed chase ensued. The vehicle hit a curb, blew a tire, and came to a stop. As it did, the police witnessed Eddie dash out of the car; while one officer followed Eddie, another approached the vehicle and found petitioner sitting in the front passenger seat. In plain view on the back seat was the victim's briefcase containing the $17,000, and on the floor, a gun loaded with five live rounds and one spent shell.

For his role in these actions, petitioner was convicted of first degree robbery and second degree murder, and sentenced to concurrent prison terms of twenty years to life for the murder and twelve and a half to twenty five years for the robbery.[1] Having completed his direct appeal and post-conviction remedies in state court, petitioner seeks a writ of habeas corpus under 28 U.S.C. § 2254, claiming violations of his rights under the Fourth, Fifth and Sixth Amendments. For the reasons set forth below, the application is denied and the petition dismissed.

## DISCUSSION

### I. The Fifth Amendment Claim

<u>Background</u>

In a statement he gave to police after ten hours in custody, petitioner admitted that he "was at Audrey's house at about 11:00 p.m. with Audrey and Eddie," when "Audrey was talking about her friend . . . [who] would be in Queens on March 4, at about 11:00 a.m.," and who "was

---

[1] The verdicts of guilt came in a re-trial; the jury in petitioner's first trial was unable to reach any verdict.

going to have money with him." H. 165.[2] Petitioner also admitted that, at the time of this discussion, "Eddie was sitting on the floor in the room with the gun in his hand," and that "Eddie then put the gun down on the floor and wiped it off with a sock." Id. Petitioner then described the robbery itself: "At about 7:00 a.m., Eddie came to Audrey's, and we left for me to point out [the victim] . . . . We went to 205-26 Linden. I pointed [the victim] out to Eddie. Then we went around the block. We came back around, Eddie got out of the car. I heard a scream and a pop and Eddie jumped back in the car and we left." Id.

Petitioner moved before trial to suppress this statement, claiming it was coerced and made before he was read his Miranda rights.

Petitioner also sought to suppress as the product of alleged coercion an exculpatory statement that he made to police several hours earlier. In that statement, petitioner denied knowing "what this is all about" and sought to explain his presence at the scene. Hearing Decision at 9. He claimed he had only met Eddie (the shooter) that morning, and believed him to be a taxi driver because he pulled over when petitioner was looking for a ride.

At the suppression hearing, which lasted five days, both petitioner and his co-defendant testified and the People's witnesses were extensively cross-examined. In a twenty-five page decision that impressively inventories the testimony, the hearing court found both statements admissible. See People v. Ault, Ind. No. 1185/95, Decision and Order (Sup. Ct. Queens Co. June 6, 1997) (Braun, J.) ("Hearing Decision"). The court made clear that its detailed findings of fact were credibility-based: "[t]he Court finds the testimony of the People's witnesses to be candid

---

[2] References are to transcript pages from petitioner's suppression hearing ("H") or second trial ("T").

3

and credible in all relevant and pertinent aspects," and "[t]he Court declines to credit the testimony of [petitioner and co-defendant] and the defense witnesses except to the extent it is corroborative of and consistent with the testimony of the witnesses called by the People." Hearing Decision at 2.

Addressing the statements separately, the hearing court first concluded as a matter of law that petitioner's exculpatory statement was spontaneous and not the result of interrogation. Id. at 22. Specifically crediting the testimony of Detective Quinn, the court found no evidence of coercive circumstances. To the contrary, the court found that Quinn "casually checked in" with petitioner in the interview room at approximately 6:00 p.m., at which point the two briefly exchanged words. Id. at 7-8. When Quinn told petitioner he would return to speak with him later, the court further found, petitioner asked to talk to his stepbrother, an officer named Carter who worked in the same precinct. Id. The court found that it was "at around the time they were discussing locating [petitioner's] stepbrother" that petitioner volunteered an exculpatory statement to Quinn. Id.

In making these findings, the hearing court declined to credit petitioner's testimony to the contrary, including petitioner's claims: (i) that Quinn had pressured him by entering the room several times, smacking him in the face, and telling him he would be released if he made a statement, (ii) that the statement was not spontaneous but a response to Quinn, with pad in hand, specifically asking him what he was doing in the car, and (iii) that Quinn denied his requests to use the telephone or the bathroom. See H. 629-33, 639, 644-47, 652, 670-71.

Turning to the partial confession, the hearing court concluded that the statement was also "voluntarily made," Hearing Decision at 24, finding that petitioner made the statement only after

4

Quinn "fully and properly" advised petitioner of his Miranda rights. Id. at 8. The court specifically found that: (i) Quinn asked petitioner if he understood each right as it was read to him, (ii) petitioner responded affirmatively, (iii) petitioner then signed the Miranda form to acknowledge his understanding, (iv) Quinn transcribed what petitioner said and reviewed it with him, and (v) petitioner then signed his statement. Id. at 8, 22. The court also found that Quinn "had no difficulty in communicating" with petitioner, and that there "was no evidence of coercion" or "lack of understanding or awareness" on petitioner's part. Id. at 22-23.

In making these findings, the court rejected as a factual matter petitioner's claim that he was not read his rights until after he gave his confession as well as his claim that he was forced to sign a blank Miranda form. See id. at 2. Likewise, the court declined to credit petitioner's testimony claiming that Assistant District Attorney Kim Marcus was introduced to him as *his* attorney and that Quinn's transcription of his statement was not accurate. See H. 638-39, 653-59, 670-72.

Affirming petitioner's conviction, the Appellate Division accorded "great deference" to the hearing court's "factual findings and credibility determinations," and rejected petitioner's claim that Quinn's testimony was "incredible" or "patently tailored to nullify constitutional objections." People v. Ault, 308 A.D.2d 594, 595 (2d Dep't 2003).

Analysis

The factual findings of the hearing court are presumed correct. See 28 U.S.C. §2254(e)(1). The presumption of correctness "is particularly important when reviewing . . . assessment[s] of witness credibility." Cotto v. Herbert, 331 F.3d 217, 233 (2d Cir. 2003).

5

Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. §2254(e)(1). Although "a federal [habeas] court can disagree with a state court's credibility determination," Miller-El v. Cockrell, 537 U.S. 322, 340 (2003), the Court must nevertheless be "guided by AEDPA." Id. See 28 U.S.C. § 2254(d)(2) (writ can be granted only if state court made an "unreasonable determination of the facts in light of the evidence presented"). As in Cotto, where a "credibility clash" was "resolved by findings of the [judge] who observed the witnesses" and found that "the People's evidence was credible, the contrary evidence not," the state court decision here is subject to an "extremely narrow scope of review." Cotto, 331 F.3d at 233.

Petitioner does not point to any material evidence that the hearing court overlooked or otherwise persuade this Court to second-guess the credibility assessments made by the court that had the unique advantage of observing each witness testify.

That court also furnished quite compelling reasons for its credibility findings. As its decision explains in detail, the court declined to credit petitioner largely because of material inconsistencies in his testimony. For example, the court found that, "[petitioner's] own testimony that he did not seek advice or counsel from A.D.A. Marcus," even though she was in the room when Quinn was completing the Miranda form, H. 661, "does not support his present claim that he believed that she was his lawyer and that both [Quinn and Marcus] misrepresented her as his attorney." Id. at 24. Petitioner's claim that Quinn wrote down only "what he wanted to write," the court found, was "incredible," given that Quinn *did* transcribe petitioner's allegations of abuse by other officers (specifically, Quinn included petitioner's claim that arresting officers "stood on [his] back" and "called him scum," id. at 24; H. 166). The court

also cited the fact that petitioner admitted that Quinn corrected portions of the statement at his request. Id.; H. 664-67.

Similarly, the hearing court placed weight on the inconsistency between petitioner's claim that Quinn mistreated him and petitioner's admission that he did not report any alleged mistreatment by Quinn to his brother, "a police officer in the same precinct where he was being held." Id. at 23. Finally, the hearing court explained that it declined to credit petitioner's claim that Quinn denied his requests for a telephone, bathroom or a lawyer because it found "credible evidence" that Quinn honored petitioner's request to speak with his stepbrother. Id.[3]

The hearing court also furnished reasonable grounds for its decision to credit the testimony of Detective Quinn despite his imperfect recollection. As petitioner emphasizes here, the hearing court observed that, on direct, Quinn did not recall petitioner's initial (exculpatory) statement, but testified to it only when confronted with documents on cross-examination. But the hearing court rejected petitioner's view that Quinn's initial lack of recall rendered the entirety of Quinn's testimony suspect, and indeed found Quinn's lack of immediate recall understandable:

> Although Det. Quinn initially failed to recall the earlier statement, his recollection was refreshed and his recitation of the facts involving the making of the first statement is credible. Det. Quinn was conducting an investigation of an apparent homicide. He was interviewing several witnesses as well as [codefendant] throughout the day. Information gathered by numerous officers involved had to be coordinated. It is entirely credible that an exculpatory statement made by [petitioner] when Det. Quinn casually checked in with him at about 6:00 p.m. was not recorded at the time and not independently recollected during the detective's direct testimony.

Id. at 22.

---

[3] Quinn asked other officers whether they knew Carter, eventually learning from the desk sergeant that Carter was not at the precinct. Quinn asked the sergeant to tell Carter, when he arrived, to contact Quinn. Eventually Quinn did speak with Carter and then brought him to the interview room to speak with petitioner. Hearing Decision at 7.

7

There is no dispute that, if credited, Quinn's testimony amply supports the hearing court's findings of fact. Because the credibility findings also find appropriate support in the record, the hearing court's factual and credibility findings are conclusive here. Miller v. Fenton, 474 U.S. 104, 110, 117 (1985) (although "the ultimate issue of 'voluntariness' is a legal question requiring independent federal determination" by a habeas court, state-court findings on "subsidiary [factual] questions. . . are conclusive on the habeas court if fairly supported in the record").

Turning from the factual findings to the "ultimate" legal question of voluntariness, Miller, 474 U.S. at 110, this Court concludes that the state court decision not to suppress petitioner's statements was not contrary to or an unreasonable application of Supreme Court law. First, the hearing court's conclusion that petitioner's exculpatory statement was spontaneous and not the product of an "interrogation" is consistent with controlling federal law. As the Supreme Court had made clear, "interrogation" is "either express questioning or its functional equivalent" and refers to "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). The fact that petitioner had a verbal exchange with Quinn while in custody does not make his statement the product of an interrogation because "'[i]nterrogation,' as conceptualized in the Miranda opinion, must reflect *a measure of compulsion above and beyond that inherent in custody itself.*" Innis, 446 U.S. at 300 (emphasis added). Nor did the content of Quinn's words create an interrogation: Quinn's remark that he would return in a while is not the "functional equivalent" of interrogation, see Mackenzie v. Portuondo, 208 F. Supp.2d 302, 325 (E.D.N.Y. 2002), and pedigree questions are "normally attendant to arrest and custody" and therefore "do not pose the dangers Miranda was

8

designed to check." United States v. Casimiro, 356 F.3d 254, 259 n. 2 (2d Cir. 2004) (internal quotations omitted).

Second, the state court did not unreasonably apply, or act contrary to, Supreme Court law when concluding that petitioner's confession was voluntary. Voluntariness is determined by the totality of the circumstances, e.g., Arizona v. Fulminante, 499 U.S. 279, 286-89 (1991), which includes "the entire course of police conduct with respect to the suspect," Oregon v. Elstad, 470 U.S. 298, 318 (1985), the ultimate inquiry being whether petitioner was "subjugate[d] . . . to the will of his examiner." Innis, 446 U.S. at 299. Here, as its lengthy and detailed decision reveals, the hearing court proceeded precisely as the Supreme Court requires, having examined "the entire course" of Quinn's interaction with petitioner before concluding that petitioner made his statement voluntarily. Nothing in the record suggests the subjugation of petitioner's will to Quinn's.[4]

## II. The Fourth Amendment Claim

Petitioner's claims that he was arrested without probable cause, and that his statements to law enforcement officials should be suppressed as the fruit of an illegal arrest, were litigated at his pre-trial hearing and are not cognizable in this habeas corpus proceeding. Stone v. Powell, 428 U.S. 465 (1976).

---

[4] Although not cited in the hearing court's decision, the Court notes that even within petitioner's implausible account of Quinn's procedural gaffes, he admitted that he did hear Quinn read each of his Miranda rights to him, that he saw Quinn write the word "yes" in each box on the form, and that he did not stop Quinn from doing this or tell Quinn that any of those "yes's" was incorrect. H. 658-59.

## III. The Claimed Ineffective Assistance of Trial Counsel

Petitioner's claim that his trial counsel rendered constitutionally ineffective assistance has been twice rejected on the merits in the state courts (both on his direct appeal and in his section 440 motion), and quite appropriately. Trial counsel is "strongly presumed" to have rendered constitutionally adequate assistance. Strickland v. Washington, 466 U.S. 668, 690 (1984). That presumption fully obtains here. In the §440 decision, the trial court found, based on the proceedings in their entirety, that counsel "vigorously and professionally" litigated petitioner's case, and saw no evidence that "counsel's representation was anything less than thoroughly competent." People v. Ault, no. 1189/95 (Sup. Ct. Queens Co. March 17, 2005) (Flaherty, J.), *Mem.*, slip op. ("440 Decision") at 3, 4.[5] The court's context-based analysis is a proper application of Strickland. See Lindstadt v. Keane, 239 F.3d 191, 191 (2d Cir. 2001) (any counsel errors must be considered in the "aggregate" rather than in isolation; courts directed "to look at the 'totality of the evidence before the judge or jury'") (quoting Strickland, 466 U.S. at 695-96).

Turning to the particular acts of counsel at issue, the § 440 court found that the allegations were mostly "speculative" and related either to unassailable matters of trial strategy or gestures that could not have prejudiced petitioner. 440 Decision at 3-4. The state court's rejection of petitioner's claim, therefore, is not contrary to or an unreasonable application of Strickland. In fact, the 440 Decision here exhibits an eminently sound application of the principles and policies embodied in the Strickland decision.

---

[5] The Appellate Division ruled that petitioner's ineffectiveness claim was "primarily based on matters dehors the record" and therefore not reviewable, but also ruled that "[t]o the extent that his contention can be reviewed, the record demonstrates that [petitioner] received meaningful representation." People v. Ault, 308 A.D.2d at 595.

The most vigorously asserted branch of petitioner's ineffectiveness claim faults trial counsel for turning down the trial judge's offer to give a circumstantial evidence charge. Although the trial court was very inclined to give the instruction, T.1433-44,[6] it is clear that the charge was not required: New York law mandates the charge only in "wholly circumstantial" cases, People v. Guidice, 83 N.Y.2d 630, 636 (1994), and petitioner's was not such a case, for New York considers a "relevant admission of guilt" such as petitioner's partial confession to be direct evidence. Id. Counsel cannot be declared ineffective for saying no thank you to an optional charge. See Aparicio v. Artuz, 269 F.3d 78, 99 (2d Cir. 2001) ("when a trial court's instruction is legally correct as given, the failure to request an additional instruction does not constitute deficient performance" under Strickland).

In its § 440 decision, the trial court noted that, "it was the prosecutor who obviously saw [the circumstantial evidence charge] as advantageous to her cause since she was the advocate who pressed the Court to so charge, " 440 Decision at 3, and concluded that trial counsel's decision to decline the court's offer to give the charge was "a strategic decision thoughtfully arrived at" and not an act of incompetence. Id. This aspect of the state court decision conforms squarely with Supreme Court law. See Strickland, 463 U.S. at 689-90; Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir.) (under Strickland, a reviewing court "may not use hindsight to second-guess [counsel's] strategy choices"), cert. denied, 513 U.S. 820 (1994).

A single theme underlies most of petitioner's remaining allegations: namely, that there existed several individuals—a Mr. Pope and his daughter, and a Lennell Johnson—who were at

---

[6] During the charging conference, the court remarked that the circumstantial evidence charge is "usually" of benefit to the defendant, T. 1444, but noted in its 440 decision that "whether such an instruction helps or hurts a party is questionable." 440 Decision at 3.

11

the scene at or just before the time of the crime and gave statements to police, but were not called to testify at trial. Petitioner alleges that these witnesses would have given testimony about the position of the blue Buick (specifically, that it had at some point been "double parked") and about its occupants that, if believed, would have led to petitioner's acquittal. Petitioner then casts as separate branches of his ineffectiveness claim the failure of his trial counsel to "seek, locate, or interview or call" any of these individuals, Pet. Aff. at 4-5, and the decision of his counsel not to request a missing witness charge relating to them.

These are frivolous claims that the Court denies under the second prong of Strickland. See Strickland, 466 U.S. at 697 ("there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if [a petitioner] makes an insufficient showing on one"). The dispositive inquiry "is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." Id. at 695. Here, in light of the overwhelming evidence of petitioner's role in the criminal events, the testimony at issue—whatever it might have been—could not have created reasonable doubt about petitioner's guilt.

Indeed, what petitioner claims would have been the contents of that testimony is only vaguely, sparsely and somewhat inconsistently delineated in his pro se papers. In one document, petitioner asserts that Mr. Pope and his daughter "observed . . . the fleeing of the car and could have gave [sic] a description of the driver," Pet. Aff. at 5, and asks this Court to infer from that assertion the prospect of proof that he was not the driver the blue Buick. As to Johnson, petitioner in another document makes a slightly different claim, asserting that Johnson "was watching the entire incident unfold from where the blue Buick double parked until the shooting,"

12

and "more importantly, he would have testified that [petitioner] was not the shooter and was not sitting in the blue Buick." Pet. Mem. at 25.

The prosecution, of course, never contended the petitioner was the *shooter*, and petitioner admitted to Quinn that he was indeed sitting in the Buick before, during and after the robbery and murder, so what can petitioner be claiming? He has filed several briefs on this point alone. Having canvassed the record to make sense of petitioner's claim, therefore, the Court reads petitioner's claim as being addressed to the identity of the driver of the blue Buick and by extension, to the theory of accomplice liability upon which petitioner's conviction was premised. The record confirms, at the very least, that a Pope family and a Lennell Johnson actually existed, but otherwise reveals petitioner's claims to be mostly speculation.[7]

Petitioner's apparent belief is that the absent testimony would have refuted the account given by Gruber, the key eyewitness at trial. Gruber's credibility, petitioner argues, was vulnerable because before the grand jury and at the first trial, Gruber described the car only as being double parked; the detail about the vehicle following Eddie down the street during the crime, which arguably makes a more compelling account of criminal assistance by the person driving the vehicle, appears only in Gruber's account at the second trial. The inference petitioner presses is that Gruber falsely enhanced his testimony in the retrial after the jury in the first trial

---

[7] The Court has culled the following from the record: (i) Quinn testified that he "spoke to Lennell Johnson" and that he "spoke to a motorist and daughter, the last name is Pope," T. 1111; (ii) petitioner's counsel spoke to the trial court of "Lennell Johnson, who they're unable to produce," T. 1300, and (iii) respondent's brief asserts that, "although Johnson was not available at trial, he did, in fact, testify before the grand jury and nothing about his testimony exculpates petitioner." Resp. App. Br. at 45. Respondent also asserts that "Johnson had been unavailable for several years as a result of a car accident," Resp. Br. at 44, and cites only to missing pages from the trial transcript.

13

failed to reach any verdict. But this "evolution" of Gruber's testimony through several prior proceedings was fully brought out on cross-examination during the second trial. T. 840-95. More critically, petitioner offers no particulars about the alleged unsolicited testimony or how, if at all, it would have undermined Gruber's account. Indeed, Gruber described the vehicle as having been initially double-parked, and petitioner does not show that these uncalled witnesses would have stated that the vehicle *never* moved. Nor does petitioner claim that these individuals could dispute Gruber's account of the deadly actions of the man who emerged from the parked vehicle.

Even with confirmation from the Pope family or Johnson that the vehicle had at some point been double-parked, the testimony of Gruber and the surveilling officers was still sufficient for a rational jury to find beyond a reasonable doubt that petitioner was the driver: (i) Gruber saw the vehicle moving slowly down the street with the door open while Eddie was attacking and killing the victim, saw Eddie enter the rear of the vehicle after his encounter with the victim, and was sure that no one was in the front passenger seat; (ii) police did not lose sight of the vehicle from the moment they began the chase, within minutes of the crime; and (iii) police observed Eddie jumping out of the disabled vehicle and, when they reached the vehicle, found petitioner in the front passenger seat. Clearly the vehicle was not driving itself, and the jury was perfectly within its bounds in declining to speculate about a phantom third individual referred to in petitioner's partial confession and in discrediting petitioner's claim that Eddie drove.[8]

In any event, petitioner's own statement was sufficient to establish, beyond a reasonable

---

[8] In the statement he gave to Quinn, petitioner claimed that after the robbery, Eddie "jumped back in the car and we left," and that "a few blocks later, Eddie climbed over the seat and the driver got out of the car and Eddie continued to drive away."

14

doubt, that he was an accomplice to the robbery and murder whether or not the vehicle remained parked during the robbery and murder, and whether or not petitioner was the driver: by petitioner's own admission, he planned the robbery and performed an act (identifying the victim) indispensable to its execution. Petitioner also admitted that Eddie openly handled the gun while he, Eddie and Audrey planned the crime, so a reasonable jury could conclude that petitioner had reason to expect that a gun would be used in the robbery.

The final two branches of petitioner's ineffectiveness claim require little additional discussion. The trial court correctly rejected petitioner's challenge to counsel's failure to move for a speedy trial dismissal. The trial court found no basis for believing that "this rarely granted motion" would have succeeded in petitioner's case, 440 Decision at 3, and that decision is not an unreasonable application of controlling Supreme Court law. Although four years passed between petitioner's arrest and first trial, prejudice is essential to a successful constitutional speedy trial claim. Barker v. Wingo, 407 U.S. 514, 532 (1972). Petitioner' prejudice claim, however, is based on the same evidentiary premise already rejected – i.e., that he would have been acquitted had the allegedly missing scene witnesses testified that the blue Buick was double parked. (The record also fails to establish that these witnesses would have been available had petitioner's trial occurred at an earlier date). Counsel, therefore, was not ineffective for electing not to make a motion asserting that absence as prejudice. Strickland, 466 U.S. at 695.

Lastly, petitioner's attack on the words counsel used to seek a dismissal at the end of the case, as the trial court correctly found, was "academic," given that the proof of defendant's guilt "was more than sufficient." 440 Decision at 4. Counsel "move[d] to dismiss the indictment on the grounds that the People failed to establish a prima facie case" and "on the grounds that the

15

evidence that has been presented is not sufficient to meet the requirement of proof beyond a reasonable doubt." T. 1631. The trial court had no difficulty understanding counsel's requests and denied them. Id. Although the Appellate Division ruled that sufficiency was not properly preserved for appellate review, petitioner was not prejudiced because the Appellate Division found, in any event, that the evidence "was legally sufficient to establish [petitioner's] guilt beyond a reasonable doubt." People v. Ault, 308 A.D.2d at 595.

It is indeed unfortunate when a criminal defendant facing a substantial term of incarceration genuinely feels that his counsel furnished him with representation below the standards guaranteed by the Constitution. But this petition illustrates a disturbing misuse of that constitutional claim and of the habeas petition itself. The erecting of such a needless analytical edifice and the relentless sounding of such utterly false alarms as petitioner has done here fall in the category of fanciful evidentiary antics that have no place in habeas litigation, as they sully the dignity of the great writ and make sport of its special role. The only question on habeas is whether the conviction was obtained in violation of the Constitution, not whether the adding of special effects and re-mixing of evidence can make the conviction come out sounding like an acquittal.

## CONCLUSION

For all of the foregoing reasons, the application for relief is denied and the petition dismissed. Because petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability shall not issue. In addition, this Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be

taken in good faith. <u>Coppedge v. United States</u>, 369 U.S. 438 (1962). The Clerk of the Court is directed to close this case.

SO ORDERED.

Dated: Brooklyn, New York
August /8, 2008

            s/ Judge Raymond J. Dearie
            _____
            RAYMOND J. DEARIE
            Chief United States District Judge